No. 02-789

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 146

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

THOMAS WAYNE MIKESELL,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
In and for the County of Rosebud, Cause No. DC-99-28
The Honorable Joe L. Hegel, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        John Houtz, Attorney at Law, Forsyth, Montana

        For Respondent:

        Honorable Mike McGrath, Montana Attorney General, Pamela P. Collins, Assistant Attorney General, Helena, Montana; Michael B. Hayworth, Rosebud County Attorney, Mark Murphy, Special Deputy County Attorney, Forsyth, Montana

Submitted on Briefs:  August 28, 2003

Decided:  June 8, 2004

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Thomas Wayne Mikesell (Mikesell) was charged by information, in the Sixteenth Judicial District, Rosebud County, with five counts of felony theft in violation of § 45-6-301(1)(a)(7)(b) and five counts of illegal branding in violation of § 45-6-327. In the alternative, he was charged with one count of felony theft as part of a common scheme in violation of § 45-6-301(1)(a)(8) and five counts of illegal branding in violation of § 45-6-327. Mikesell eventually pled guilty to three counts of illegal branding. The District Court deferred sentencing for three years and ordered restitution in the amount of $42,181.81.[1] Mikesell appeals from the restitution award. We affirm in part and remand for clarification.

¶2 We restate the issues on appeal as follows:

¶3 1. Whether Mikesell should pay for the loss of fifty-five head of cattle.

¶4 2. Whether Mikesell is responsible for the feed bill.

¶5 3. Whether the District Court erred in determining that Mikesell has the ability to pay restitution.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Mikesell leases a ranch, Canyon Creek Ranch, south of Birney. As part of his business operations, he enters into grass or pasture permit agreements with some cattle owners, and calf-share agreements with other cattle owners. Under the calf-share

---

[1] The written judgment read that the restitution amount was $42,000 but the oral sentence listed several amounts that total $42,181.81. The amount stated in the oral sentence prevails. *State v. Lane*, 1998 MT 76, ¶ 40, 288 Mont. 286, ¶ 40, 957 P.2d 9, ¶ 40.

agreements, the other party would run cattle on Mikesell's land; Mikesell would be responsible for the cattle's care; then, when the cows had calves, Mikesell would brand the calves with the other party's brand. After accounting for all cattle, the other party would give Mikesell a bill of sale for a percentage of the calves.

¶7 In June of 1998, Bill McKinney (McKinney), a neighbor of Mikesell's and a deputy brand inspector for the Montana Department of Livestock, while on Mikesell's land with permission to retrieve a bull, noticed that a number of cows with assorted brands were paired with calves that had Mikesell's brand. McKinney reported this to the District Livestock Inspector, Gary Gatrin, who contacted the District Brand Inspector, Pat Anderson (Anderson), and advised Anderson of McKinney's findings. Anderson contacted one of the brand owners, the Hannums, and Mrs. Peary Hannum told Anderson that she and her husband had never given Mikesell a bill of sale for any cattle. Based on this information, Anderson obtained a search warrant and conducted a search on Mikesell's land. In addition to the group of cattle the deputy brand inspector observed, Anderson found other cattle with brands other than Mikesell's.

¶8 All of the cattle were seized and taken to the Miles City Livestock Commission (the Livestock Commission). Mikesell was charged by information on October 18, 1999, with five counts of felony theft in violation of § 45-6-301(1)(a)(7)(b) and five counts of illegal branding in violation of § 45-6-327. In the alternative, he was charged with one count of felony theft as part of a common scheme in violation of § 45-6-301(1)(a)(8) and five counts of illegal branding in violation of § 45-6-327. In October of 2001, after an initial trial date

3

had been vacated in an attempt, by the parties, to resolve the matter without a trial, Mikesell pled guilty to three counts of illegal branding: Count VI, Count VIII, and Count X.

¶9 Count VI was for branding the calf of a cow belonging to Loren Brooks (Brooks).[2] Brooks had a pasture permit agreement with Mikesell. When Brooks retrieved his cattle from Mikesell's land, Brooks noticed that one of the cows in the bunch retrieved from Mikesell's Ranch was not Brooks' so he returned the cow to Mikesell. Mikesell testified that the cow was Brooks' and that Mikesell had tried to return it but Brooks insisted the cow was not his. At the change of plea hearing, Anderson testified that Brooks after looking at a picture of the seized cow, had told him that the cow Anderson had seized "absolutely was a different cow than" the cow Mikesell had tried to return to Brooks.

¶10 Count VIII was for branding the calf of a cow belonging to Pete Muri (Muri). Muri's cows were pastured with cattle belonging to Peary Hannum (Hannum) on Mikesell's land. When the cattle were shipped out, Mikesell held back some of Hannum's cattle for money Hannum owed Mikesell and Mikesell held back one of Muri's cows. Mikesell testified that he did not know the cow was Muri's and that had he known that the cow was Muri's, he would not have kept the cow.

---

[2] The pre-sentence investigation report indicates that the cow and calf belonged to Gary Bishop d/b/a Brooks Ranch. The motion and affidavit for leave to file information direct also references a Gary Bishop in relation to Brooks Ranch. However, Anderson, during the change of plea hearing and the sentencing hearing, referred to a Loren Brooks in relation to Brooks Ranch. As such, we will refer to the cattle as belonging to Loren Brooks.

¶11    Count X was for branding the calf of a cow belonging to Larry Grantier (Grantier). Mikesell testified at the change of plea hearing, that he had purchased a heifer calf from Grantier for $375 but failed to get a bill of sale. Mikesell further testified, that he later branded the heifer's calf knowing that he did not have a bill of sale for the heifer and that he legally could not brand the calf. Anderson testified that Grantier had sold Mikesell ten head of cows, that there was a brand inspection and bill of sale on file for that sale, and that the heifer in question was not a part of the sale.

¶12    A pre-sentencing investigation (PSI) was conducted by John Uden (Uden). Uden had to complete the PSI report without Mikesell's 1999 and 2000 tax returns because the returns had not been prepared. As a result of this, Uden noted in the PSI report, under the financial portion of the report, that he was "not able to make an educated determination as to the Defendant's financial status relative to paying the restitution . . . ." However, under evaluation/recommendation, Uden stated that Mikesell "does have the ability to pay the restitution . . . ." In addition, the plea agreement read that the State would be allowed to recommend restitution for "[f]eed and pasturage bills for cattle retained," [for] "feed as evidence," [and for] "[u]p to a maximum of restitution." At the change of plea hearing on October 29, 2001, "the maximum restitution the State [would] ask for [was] $10,000."

¶13    The District Court held a sentencing hearing on April 29, 2002, and awarded $10,000 to the Miles City Livestock Commission for the seized cattle's feed bill; $1,636.36 to Muri for three cows; $545.45 to Brooks for one cow; and $30,000 to Grantier for fifty-five head

of Grantier's cattle that were missing after being pastured on Mikesell's land. Mikesell appeals the amount of the restitution award.

## STANDARD OF REVIEW

¶14 Determination of the appropriate measure of restitution is a question of law. The standard of review of a district court's conclusions of law is whether the court's interpretation of the law is correct. *State v. Pritchett*, 2000 MT 261, ¶ 18, 302 Mont. 1, ¶ 18, 11 P.3d 539, ¶ 18.

## DISCUSSION

## ISSUE ONE

¶15 *Whether Mikesell should pay for the loss of fifty-five head of cattle.*

¶16 Mikesell argues that under § 46-18-243(1)(a), MCA, the loss of Grantier's fifty-five head of cattle did not "arise out of" the illegal branding of Grantier's calf. The State maintains that because Mikesell did not argue that the loss of the cattle was not related to the Count to which he pled guilty and instead argued that the matter concerning the lost fifty-five head of cattle was a civil matter, he waived his right to object on appeal.

¶17 "We have held that a criminal defendant is liable for restitution for offenses to which the defendant has admitted, as a defendant is required to make full restitution for pecuniary losses 'arising out of the facts or events constituting the offender's criminal activities,' pursuant to §§ 46-18-241(1), MCA (1997), and §§ 46-18-243(1)(a), MCA (1997)." *State v. Benoit*, 2002 MT 166, ¶ 27, 310 Mont. 449, ¶ 27, 51 P.3d 495, ¶ 27. The loss of

6

Grantier's fifty-five head of cattle from possible drowning, or other untimely demise,[3] is not a pecuniary loss that arose from Mikesell's illegally branding Grantier's calf. Mikesell, as far as these proceedings are concerned, is not responsible for the restitution of Grantier's fifty-five head of cattle.

¶18    As to the State's argument that Mikesell did not use the appropriate language in protesting restitution for the fifty-five head of cattle, we conclude that it is without merit. First,  Mikesell testified that he thought the matter concerning the fifty-five head of cattle was a civil dispute. In addition, Mikesell's attorney, during closing arguments,  argued that "[t]he Grantier matter . . . is a civil dispute."  Lastly, it is interesting to note that Grantier testified that he had considered bringing a *civil* suit against Mikesell due to the loss of the fifty-five head.  It is obvious to this Court that if a party argues that a particular issue is a civil matter, and thus not within the criminal proceeding, that such an argument is the same as arguing that the matter did not "aris[e] out of the facts or events constituting the offender's criminal activities. . . ."  Section 46-18-243(1)(a), MCA.

¶19    Accordingly, because the loss of Grantier's fifty-five head of cattle did not arise out of Mikesell's illegally branding Grantier's calf, we reverse that portion of the District Court's order awarding Grantier $30,000.

---

[3]  The record is not entirely clear as to what happened to the cattle.  It appears that twenty-nine head--and this number is in dispute--walked out on a frozen river and fell in and drowned.  The remainder apparently died from other unknown causes.  Regrettably, very few carcasses of either unfortunate lot have been recovered.

**ISSUE TWO**

¶20    *Whether Mikesell is responsible for the feed bill.*

¶21    Mikesell argues that he is not responsible for the feed bill because, as early as February of 1999, Mikesell had requested that the cattle be released from the Livestock Commission. The State insists that Mikesell is responsible for the feed bill because the State wanted the cattle released to the rightful owners and Mikesell repeatedly requested that the cattle be released to him. In addition, the State argues that, when the plea agreement was entered into, Mikesell understood that he was going to have to pay restitution for all or some of the feed bill.

¶22    We agree with the State. This case has spanned several years and the cattle were kept at the Livestock Commission for a good portion of that time. While Mikesell did request that the cattle be released, the record reveals that Mikesell wanted the cattle released to him and the State wanted the cattle to be released to the brand owners. The parties did not come to an agreement until December 8, 2000, that the cattle could be sold and the proceeds held by the Department of Livestock until further order of the District Court. Mikesell could have avoided paying a feed bill if he had consented to the cattle's release to their rightful owners. Instead, the cattle remained at the Miles City Livestock Commission because Mikesell insisted that cattle, that did not belong to him, should be released to him.

¶23    Therefore, we hold that the District Court was correct in determining that Mikesell was responsible for the Livestock Commission feed bill.

**ISSUE THREE**

¶24    *Whether the District Court erred in determining that Mikesell has the ability to pay restitution.*

¶25    The District Court concluded that Mikesell "ought to be able to pay the [$]42,000 within the three years" of his deferred sentence, based in part on findings regarding Mikesell's net worth. The District Court found that Mikesell showed "total liabilities and net worth of [$]110,600.00, a net worth of [$]86,000." These figures were taken from a First Interstate Bank (FIB) Agricultural Financial Statement (the Statement). The Statement lists Mikesell's liabilities as $8,618.18 for a secured note owed to FIB; $3,000 for accounts due; and a deferred liability of $12,340 for contracts due after one year. This statement, however, does not reflect all of Mikesell's liabilities. Mikesell testified that he still owed $10,000 on the $20,000 1999 lease payment for his ranch and $20,000 on the 2002 lease payment; that he owed Key Bank $36,000 from a $55,000 judgment; and that he owed a bank in Ashland $6,000. In addition, Mikesell's tax returns for 1999 and 2000 show losses greater than $50,000.

¶26    Mikesell is entitled to have the restitution award supported by evidence. Section 46-18-244(2), MCA (1999); *State v. Farrell* (1984), 207 Mont. 483, 492-93, 676 P.2d 168, 174. We are not convinced that the record accurately reflects Mikesell's ability to pay restitution.

¶27    The District Court determined that Mikesell should be able to pay $7,500 a year in payments even though Mikesell's attorney had told the District Court that Mikesell could only handle monthly payments between one to three hundred dollars. The District Court also stated that if Mikesell could not make $7,500 a year payments, then when his calves were

9

sold each November, the money from the calves would go towards the restitution, and beyond that, Mikesell should sell assets to meet the restitution payments.

¶28 We are unclear on how income from the sale of calves shows that Mikesell has the ability to pay restitution. Uden testified that most ranchers take out a loan each year to pay for food and necessities for their families and for their cattle's feed and once they sell the cattle, they use that money to pay off the loan. The record does not show that Mikesell has had money leftover from past calf sales, indeed, his tax returns reflect losses each year, so we are unclear on how future calf sales will generate enough funds for the Mikesells, their cattle, and restitution.

¶29 In addition, the District Court has not indicated whether any of Mikesell's assets have liens against them. In fact, the State's attorney assumed that "there aren't a whole lot of nonexempt assets." Making Mikesell sell assets that have liens against them is only going to ensure that that money goes to the entity holding the lien and not to Brooks, Muri, Grantier, or the Livestock Commission.

¶30 The record is replete with examples of Mikesell's inability rather than his ability to pay. Indeed, it appears the District Court even questioned Mikesell's ability to pay. "If [Mikesell] continues in this [ranching] business and continues to lose money, . . . I don't know where the restitution is going to come from." Due to the lack of clarity concerning Mikesell's ability to pay, we remand for further proceedings to determine Mikesell's ability to pay and to set restitution payments accordingly.

¶31     We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.


/S/ JAMES C. NELSON


We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE